Opinion filed March 19, 2021

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| *In re* MARRIAGE OF<br>STEVEN J. OSSECK, | ) ) | Appeal from the Circuit Court<br>of Boone County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| and | ) | No. 16-D-31 |
| | ) | |
| TONI R. OSSECK, | ) | Honorable |
| | ) | Ronald A. Barch, |
| Respondent-Appellant. | ) | Judge, Presiding. |

JUSTICE BRENNAN delivered the judgment of the court, with opinion.
Justices McLaren and Hudson concurred in the judgment and opinion.

**OPINION**

¶ 1    On June 13, 2017, the marriage of petitioner, Steven J. Osseck, and respondent, Toni R. Osseck, was dissolved pursuant to the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/101 *et seq.* (West 2018)). On March 6, 2020, the trial court granted Steven's petition to modify maintenance, retroactive to January 1, 2020, and subject to review on July 28, 2021. Toni appeals. She argues that Steven did not prove a substantial change in circumstances and that, even if he did, the trial court did not adequately consider the factors set forth in sections 510(a-5) and 504(a) of the (750 ILCS 5/504(a), 510(a-5) (West 2018)) when issuing the modified maintenance award. Steven responds that the March 6, 2020, order was not final and appealable, because it was temporary in duration and subject to future review by the trial court.

¶ 2    For the reasons that follow, we determine that the order was final and appealable. The trial court did not abuse its discretion in finding a substantial change in circumstances, but it did fail to adequately consider the factors set forth in sections 510(a-5) and 504(a) of the Act when issuing the modified award. We affirm in part, vacate in part, and remand.

¶ 3                                I. BACKGROUND

¶ 4    On February 18, 2016, Steven filed his petition for dissolution of marriage. On June 13, 2017, Toni and Steven, then ages 56 and 60, respectively, entered into a marital settlement agreement (MSA). The trial court approved the MSA and entered the judgment of dissolution. This ended the parties' 29-year marriage. The parties' two children had attained majority, and the younger child was set to begin college at Southern Methodist University.

¶ 5    According to the terms of the MSA, the marital estate, valued at approximately $2 million, would be split 60/40 in favor of Toni. Among other assets, Toni was awarded a California condominium, valued at $735,000, which she had been living in for the previous nine years. Steven was awarded an efficiency studio and hangar at an airpark, valued at $185,000, along with his airplane, valued at $160,000. Steven would pay for the younger child's college education, up to the tuition amount charged by the University of Illinois at Urbana-Champaign.

¶ 6    The MSA addressed maintenance in pertinent part:

"1. Amount: Husband's current gross base[1] annual income is $811,218. Wife did not work outside the home during the parties' marriage and has no income. Husband shall pay Wife $18,500 per month as and for maintenance.

_____

[1] The reference to a "base" income is a misnomer. The parties agree that, when the MSA was entered, Steven's income was entirely commissions-based.

2. Duration: The parties have been married for 29 years and, therefore, Husband's maintenance obligation shall be permanent subject to statutory termination events."

¶ 7     On August 27, 2018, Steven petitioned to modify maintenance, alleging an anticipated decrease in annual gross income to $635,000. On October 26, 2018, Steven withdrew his petition. Steven's 2018 gross income was, in fact, $766,894.

¶ 8                         A. The Subject Petition to Modify and the Hearing

¶ 9     On August 19, 2019, Steven filed a second petition to modify maintenance, which is the subject of the instant appeal. He again alleged an anticipated decrease in annual gross income, this time to $592,000.

¶ 10    On February 10, 2020, the trial court conducted a hearing on the petition to modify. Steven argued that he suffered a substantial change in circumstances when his company changed ownership and the new ownership overhauled his compensation structure, resulting in a decrease in income.

¶ 11    Prior to July 1, 2019, Steven's compensation was entirely commissions-based. He was permitted to draw up to $3000 per week as an advance on his commissions, but any draw would be subtracted from his pay at the end of the month. Under that compensation structure, Steven's annual gross income had been as follows: $742,000 (2011); $854,551 (2012); $773,166 (2013); $938,267 (2014); $808,004 (2015); $801,160 (2016); $825,160 (2017); and $766,894 (2018). Toni does not dispute these amounts.

¶ 12    After July 1, 2019, the new ownership implemented a new compensation structure. Under the new structure, Steven would receive (1) an annual base salary of $250,000; (2) the possibility of a quarterly bonus, which would be tied to the company's overall performance, and which, if earned, would range between 10% and 50% of the base salary; (3) the possibility of an annual

bonus, which would be tied to individual sales, and which, if earned, would range from 0% to 400% of the base salary; and (4) temporary "bridge" payments to help employees "more smoothly transition" to the new compensation plan. To be eligible for the annual bonus, Steven's sales would have to exceed $11 million. Under the bridge program, Steven would receive $22,222 per month between July 1, 2019, and December 31, 2019; $16,667 per month between January 1, 2020, and June 30, 2020; and $11,111 per month between July 1, 2020, and December 31, 2020. Beginning January 1, 2021, the bridge payments would terminate. In no circumstance could Steven's total annual compensation exceed $1,537,500. This information was set forth in a detailed company document, Exhibit No. 2. This information was also set forth in a chart created by Steven, "Steve's Future Compensation-Guaranteed," Exhibit No. 3.

¶ 13 As of February 10, 2020, Steven had experienced two quarterly bonus cycles. He received a $10,000 bonus for the third quarter of 2019. He received $31,000 for the fourth quarter of 2019. Steven received the 2019 fourth-quarter bonus in 2020, so he did not count it as part of his gross income for 2019.

¶ 14 Steven's gross income for 2019 was $688,000. However, his income was less in the second half of 2019, after the change in compensation structure, than in the first half of 2019. In the second half of 2019, he earned $258,000, exclusive of bonuses. This resulted in a split of $420,000 to $268,000 ($258,000 plus the $10,000 quarterly bonus), assuming the $31,000 bonus was not counted until 2020.

¶ 15 Steven believed that his quarterly bonuses in 2020 would be minimal. He explained that the business was not doing well. He believed that the two quarterly bonuses he had received were higher than technically earned; they were an attempt to convince him to stay with the company.

¶ 16 Further, he believed that his chances of receiving any annual bonus were slight. He explained that the annual bonus would be based on his individual sales. To receive any bonus, he would have to reach $11 million in sales. However, sales trended down in 2019. For example, in 2017, he reached just over $11 million in sales. In 2018, he reached $12 million in sales. In 2019, however, he reached just under $8.7 million in sales, with sales in the second half of the year down $1 million from the first half of the year. In addition to coming from Steven's testimony, this information was set forth in a chart created by Steven, "Sales Applicable to Steve," Exhibit No. 12.

¶ 17 As a result, Steven forecast his 2020 gross income to be only slightly higher than $416,666. This was the amount of his base pay, plus the bridge payments ($250,000, plus $16,667 x 6, plus $11,111 x 6 = $416,666). As he previously testified, he did not anticipate significant quarterly bonuses or any annual bonus.

¶ 18 In concluding his testimony on direct examination, Steven noted that the MSA, while not setting forth a percentage-based award, set forth a maintenance amount that happened to be 27.4% of his gross annual income at that time. He proposed a solution:

> "Q. Are you asking that the judge from the time you filed your petition to set maintenance at 27.4% of your gross income?
>
> A. I am. I think that's the only fair way of such an unpredictable compensation plan other than base pay.
>
> * * *
>
> Q. And do you believe that this is fair because while you don't believe you're going to get [bonuses] it's possible you might get [bonuses], right?
>
> A. It's possible."

Steven agreed to provide Toni with "each and every" paystub as well as his income tax returns so that she could verify his income. Steven wished to retire at age 65.

¶ 19    During cross-examination, Steven testified that Toni never worked outside the home over the course of the marriage and that she owned and maintained horses. This prompted a discussion on the parameters of the evidence for the purposes of establishing a substantial change in circumstances:

> "[STEVEN'S COUNSEL]: I think her needs now [as opposed to during the marriage] are what's important.
>
> THE COURT: Only if I grant the petition.
>
> [STEVEN'S COUNSEL]: Right, right.
>
> THE COURT: Okay. So the basis for the change has little to do with her financial situation.
>
> [STEVEN'S COUNSEL]: Correct. Absolutely. The basis for the request is my client's significant drop in income. It has nothing to do with her expenses, but I guess in my view when you're going to evaluate that, you're going to look at what the impact is on her. That's where I'm coming from, Judge."

The court instructed the parties to remain focused on the question of Steven's decrease in income.

¶ 20    Also during cross-examination, Steven agreed that, in theory, he could earn $1.5 million annually. That was the limit set forth in his compensation plan. He stated: "[It's] [n]early impossible, but I guess anything is possible." Steven acknowledged that he had underestimated his anticipated income in the past. His first petition to modify maintenance predicted a 2018 income of $635,000, and yet his 2018 income was $766,000. The subject petition to modify maintenance predicted a 2019 income of $592,000, and yet his 2019 income was $688,000. Steven explained

that the quarterly bonuses were higher than he predicted. In addition to being, in his view, somewhat gratuitous, the quarterly bonuses were based on overall company performance, which was more difficult to predict than his own individual sales.

¶ 21    Further, Steven acknowledged an upward trend in his investments. Between August 2018 and October 2019, the value of his Raymond James account had grown from $328,211 to $458,783. Similarly, his 401(k) account had grown from $156,990 to $181,846. The value of another retirement account increased from $36,930 to $42,324. The growth was due to both Steven's contributions and market forces.

¶ 22    Steven satisfied his obligation to pay for the college expenses of the parties' youngest child, their daughter, up to the cost of tuition at the University of Illinois. He determined that four years of tuition at that rate was $140,000. Therefore, after paying $144,000 total to Southern Methodist University, he ceased payments. His daughter would be able to complete the payments by accessing her trust fund.

¶ 23    Finally, before Steven learned of the new compensation structure, he took out a $150,000 loan to purchase a house for his girlfriend. His girlfriend intended to "flip" the house. When she sold it, she would repay Steven $150,000, and she would keep the profit, if any.

¶ 24    Steven called Toni to testify regarding portions of her financial affidavit, dated October 8, 2019. Toni earned $1800 in the prior year as a commission for her work as a talent scout. This was her total earned income. Toni pays estimated quarterly taxes, and she holds $40,000 in her checking account to ensure her ability to meet her tax obligations at the end of the year. Toni continues to spend money on her adult children, for airfare and for food when they visit. Toni owns a Raymond James investment account valued at $253,812. The value of this account has increased $20,000 since the entry of the MSA. She also owns a condominium in California, which she valued

at $699,000. In the MSA, it was valued at $735,000, and Zillow currently values it at $823,000. Toni believed that those values were inflated, because a similar unit in the complex, just "a little bit" smaller than hers, recently sold for $620,000. At the time of the MSA, Toni had two horses. Now, she has only one. In total, she spent approximately $30,000 annually on her horse. She paid a trainer $650 per month to acclimate her horse to the surrounding terrain, so that she could more safely ride her horse. She boarded her horse at a third-party site. She disagreed that she could save money by boarding her horse at her condominium complex. Her condominium complex had hidden fees associated with such boarding.

¶ 25    Toni moved for a directed finding, arguing that no substantial change in circumstances had occurred. The trial court denied the motion.

¶ 26    The parties then immediately proceeded to closing argument. During Steven's closing argument, he referenced the original allocation of assets and each party's respective growth on investments. The court interjected, questioning the relevance of that information:

>    "THE COURT: I'm just asking is that appropriate for me to even hear the evidence on it and take argument on it where *really I am looking at whether there's been a substantial change in compensation for him, and if so, does—what are the needs of the parties and what capacity does he have to pay*. Isn't that what I am looking at on a petition to modify?
>
>    [STEVEN'S ATTORNEY]: Yeah, but I also think that when evaluating [Toni's] needs, it's also good to know what her assets are *** so I'm just going to be brief." (Emphasis added.)

The court took the matter under advisement.

¶ 27                    B. The March 6, 2020, Written Order

¶ 28    On March 6, 2020, the trial court issued its written order. It made the following factual determinations. At the time of the original judgment, Steven's annual gross income was $811,000, and it had been in that range for many years. The monthly maintenance award of $18,500 constituted 27.4% of Steven's monthly gross income. In 2019, Steven's annual gross income was $688,369. However, Steven earned significantly more in the first half of 2019, before the new compensation structure took effect, than in the second half of 2019, after the new compensation structure took effect. Steven earned $258,000 in the second half of 2019. (Steven also earned a $10,000 bonus in the third quarter, and a $31,000 bonus in the fourth quarter, which he did not receive until 2020.) In 2020, Steven was guaranteed to earn $416,666, which was comprised of the $250,000 base salary and the bridge payments. Steven had not yet learned whether he would receive a bonus for the first quarter of 2020. In 2021, Steven was guaranteed to earn $250,000, and the bridge payments would terminate. The trial court deemed it unlikely that Steven would receive an annual bonus in the future and found that it was unclear whether he would receive any quarterly bonuses. Nevertheless, the court found it "undeniable that the revised compensation plan imposed by [Steven's] employer has materially diminished the ability to achieve historic gross earnings. Though precision is unattainable at this time, the evidence and the testimony indicated during 2020 and beyond [that Steven] will more likely than not earn less than the $688,369 he grossed in all of 2019." The court determined that Steven's diminished earning capacity under the new compensation structure constituted a substantial change in circumstances.

¶ 29    Upon finding a substantial change in circumstances, the trial court began the next stage of its analysis. We quote that analysis here:

> "*Having concluded that [Steven] met his burden of pro[ving] a substantial change in circumstances, the court must determine whether [Toni] remains in need of maintenance and, if so, [Steven's] capacity to pay maintenance moving forward.*"

The court then discussed Toni's needs and expenses and Steven's ability to pay, each in two paragraphs. Regarding Steven's ability to pay, the court concluded that Steve "does not have the capacity to pay maintenance at the rate of $18,500 per month ***.

> Based upon [Toni's] need, [Steven's] capacity *and consideration of the factors set forth in 504(a)*, ongoing monthly maintenance is appropriate."

The court then discussed guideline maintenance pursuant to section 504(b-1) (750 ILCS 5/504(b-1) (West Supp. 2019)). The court remarked:

> "A guideline maintenance calculation using [Steven's] guaranteed 2020 income of $416,664 results in a monthly maintenance obligation of $7313. But that calculation does not account for the quarterly and annual bonuses for which [Steven] is eligible."

The court noted the uncertainty of Steven's future bonuses. The court continued:

> "While there is certainly merit to imposing the guideline maintenance calculation as a base maintenance amount, along with [a] percentage payment connected to any bonuses received, the court is inclined—on [a] temporary basis—to impose maintenance as requested by [Steven] in his Petition to Modify Maintenance (27.4% of his gross). 27.4% of [Steven's] guaranteed gross for 2020 amounts to $114,165.94 ($416,664.00 x .274) or $9513.83 monthly, which is higher than the guideline calculation generated using [Steven's] guaranteed compensation. [Steven] shall also pay 27.4% of any bonuses paid to him within 30 days of receipt. Each of [Steven's] regular and bonus payments shall be

accompanied by the pay stub associated with the payment so that [Toni] can double check his math.

Absent some other substantial change in circumstances, the court will revisit maintenance [July 28, 2021]. At that point the bridge payments will have ceased and [Steven] will have had two (2) years of actual experience with the quarterly bonus program and annual individual performance program set forth in the revised compensation plan.

IV. Conclusion

For the forgoing reasons, [Steven's] Petition to Modify Maintenance is heard and granted. On a temporary basis, [Steven] shall pay [Toni] maintenance at the rate of 27.4% of his gross monthly earnings as base maintenance and 27.4% of the gross of any bonuses he receives as and for bonus related maintenance. The temporary maintenance order is subject to review and permanent calculation [July 28, 2021] or sooner upon proof of a substantial change in circumstances. The temporary change shall be effective as of January 1, 2020." (Emphases added.)

¶ 30                             C. The March 11, 2020, Clarification Hearing

¶ 31    On March 11, 2020, the court conducted a clarification hearing. It explained its overarching rationale: "[W]hat I was hoping to do was get past this transition period to have some picture as to what's going to be happening with the quarterly bonus and annual bonus to see what he's actually doing so maybe we can do something more definitive."

¶ 32    This prompted Toni to ask whether the order was final and appealable:

"[TONI'S COUNSEL]: My question to you on this, Judge, is that once you use the word 'temporary,' I don't think you have an appealable order, and I don't know if that was

your intention to make this a non-appealable order, which would put my client in the position you put her for at least another year and a half ***.

[The court takes a recess to check its notes.]

THE COURT: Counsel, I'll recall the case. I stepped back into chambers to hopefully find the numbers. I was unable to locate the specific statutory reference, ***, but it was my intention to make it temporary. ***

[TONI'S COUNSEL]: By saying you intended it to be temporary does not imply then or exactly mean that you made—that it is not appealable, or do you not have an answer to that question?

THE COURT: Well, temporary orders I don't believe are appealable."

¶ 33    The court explained why it chose a percentage-based award rather than a guaranteed dollar amount: "I don't believe I received from [Steven's counsel] or [his] client enough information to definitively include how much he's going to make. That's my reluctance about setting a specific number. I did do a calculation using what he's guaranteed to have, which is a much smaller number than he's willing to pay."

¶ 34    This prompted Toni to ask whether the court held Steven to his burden of proof:

"[TONI'S ATTORNEY]: They had the burden, and when you say, 'I didn't have enough information to make this determination,' they didn't prove their case.

THE COURT: They did prove to me that there's a substantial change. Let's not mix things up."

¶ 35    This appeal followed.

¶ 36                              II. ANALYSIS

¶ 37     On appeal, Toni argues that Steven did not prove a substantial change in circumstances and that, even if he did, the trial court did not adequately consider the factors set forth in sections 510(a-5) and 504(a) of the Act when issuing the modified maintenance award. Steven responds that the March 6, 2020, order was not final and appealable, because it was temporary in duration and subject to review. For the reasons that follow, we determine that the order was final and appealable. Further, Steven proved a substantial change in circumstances. However, the trial court did not adequately consider the factors set forth in sections 510(a-5) and 504(a) of the Act when issuing the modified maintenance award.

¶ 38     Separately, to place this case in context with other maintenance cases, we note that the trial court did not issue a guideline award amount pursuant to section 504(b-1)(1) of the Act, which applies to cases in which the parties' total annual gross income is less than $500,000, unless the court makes a finding that the application of the guidelines would be inappropriate. 750 ILCS 5/504(b-1)(1) (West 2018). The trial court believed both that Steven's income, including bonuses, could exceed $500,000 and that a guideline amount of $7313, based on the guaranteed portion of Steven's income, would be too low. In any event, we agree that, based on the evidence presented, the guidelines do not apply.

¶ 39                    A. The March 6, 2020, Order Was Final and Appealable

¶ 40     We begin with Steven's threshold argument that the March 6, 2020, post-decree order was not final and appealable, because it was temporary in duration and subject to review. Steven's position was likely prompted by the trial court's March 11, 2020, comment that, although it was "unable to locate the specific statutory reference," it intended to make the order temporary and it did not believe that temporary orders were appealable.

¶ 41    Steven's position is incorrect. Post-decree modification orders are final and appealable, even if they are temporary in duration and subject to review. See, *e.g.*, *In re Marriage of Fink*, 275 Ill. App. 3d 960, 964 (1995) (section 510 post-decree modification of child support). Setting a maintenance order for review does not render it unappealable. *In re Marriage of Cannon*, 112 Ill. 2d 552, 556 (1986); see also *In re Marriage of Lawrence*, 146 Ill. App. 3d 307, 310 (1986). Rather, " '[a] judgment is final if it determines the litigation on the merits so that, if affirmed, the only thing remaining is to proceed with the execution of the judgment.' " *Cannon*, 112 Ill. 2d at 556 (quoting *People ex rel. Scott v. Silverstein*, 87 Ill. 2d 167, 171 (1981)). Furthermore, the judgment is enforceable immediately when, even if later modified, the modification can affect only payments accruing subsequent to the filing of a petition to modify. *Id.* Such is the case here. The March 6, 2020, order awards Toni 27.4% of Steven's gross income from January 1, 2020, to July 28, 2021. Any subsequent modification can affect only payments accruing subsequent to the filing of a petition to modify. 750 ILCS 5/510 (West 2018).

¶ 42    Steven cites *pre*-decree maintenance cases and statutory authority governing *pre*-decree temporary maintenance awards to avoid application of the above authority See *In re Marriage of Rossi*, 100 Ill. App. 3d 669, 672 (1981) (a pre-decree award of $8000 to the wife was not final, where the court stated that, if it was wrong, it would correct for the award in the final judgment of dissolution); *In re Marriage of Zymali*, 94 Ill. App. 3d 1145, 1147 (1981) (absent an Illinois Supreme Court Rule 304(a) (eff. Mar. 8, 2016) finding, the pre-decree, temporary maintenance award was not appealable, because it did not dispose of all pending claims, such as in a final judgment of dissolution and property award); 750 ILCS 5/501 (West 2018).

¶ 43    Section 501(a) of the Act sets forth the procedure by which a trial court may enter temporary, pre-decree maintenance orders:

"Temporary relief. In all proceedings under this Act, temporary relief shall be as follows:

(a) Either party may petition or move for:

(1) temporary maintenance or temporary support of a child of the marriage entitled to support, accompanied by an affidavit as to the factual basis for the relief requested. One form of financial affidavit, as determined by the Supreme Court, shall be used statewide. The financial affidavit shall be supported by documentary evidence including, but not limited to, income tax returns, pay stubs, and banking statements. ***

* * *

Issues concerning temporary maintenance or temporary support of a child entitled to support *shall be dealt with on a summary basis* based on allocated parenting time, financial affidavits, tax returns, pay stubs, banking statements, and other relevant documentation, except *an evidentiary hearing may be held upon a showing of good cause*. ***

* * *

(d) A temporary order entered under this Section:

(1) does not prejudice the rights of the parties or the child which are to be adjudicated at subsequent hearings in the proceeding;

(2) may be revoked or modified before final judgment, on a showing by affidavit and upon hearing; and

> (3) *terminates when the final judgment is entered or when the petition for dissolution of marriage or legal separation or declaration of invalidity of marriage is dismissed*." (Emphases added.) 750 ILCS 5/501(a), (d) (West 2018).

Thus, it is plain that sections 501(a) and 501(d) set forth summary procedure and termination criteria that do not apply to post-decree maintenance orders.

¶ 44     Steven cites *In re Marriage of Beyer*, 324 Ill. App. 3d 305, 314 (2001), for the proposition that section 501 applies to both pre- and post-decree proceedings. However, *Beyer* concerned section 501(c-1) of the Act (750 ILCS 5/501(c-1) (West 1998), addressing interim attorney fees. On the *specific* topic of interim attorney fees, the *Beyer* court held that section 501(c-1), and the summary procedure it offered, could provide a useful alternative to the procedure offered by section 508(a) (750 ILCS 5/508(a) (West 1998)), which contemplates an evidentiary hearing prior to the award of post-decree attorney fees. *Beyer*, 324 Ill. App. 3d at 316.

¶ 45     Steven's citation to *Beyer* does not persuade us. Courts have declined to extend the applicability of section 501 to other types of decree and post-decree proceedings and orders, such as decree and post-decree maintenance proceedings and orders. See, *e.g.*, *In re Marriage of Oleksy*, 337 Ill. App. 3d 946, 950 (2003) (citing *Lawrence*, 146 Ill. App. 3d 307). Indeed, "[m]ost post-judgment orders are not temporary orders as contemplated by section 501(a)(1) of the [Act]." *Fink*, 275 Ill. App. 3d at 964. The March 6, 2020, order was final and appealable.

¶ 46                                    B. The Merits

¶ 47     An order of maintenance may be modified only upon a showing of a substantial change in circumstances since the most recent award. 750 ILCS 5/510(a-5) (West 2018); *In re Marriage of Anderson*, 409 Ill. App. 3d 191, 198-99 (2011). A substantial change in circumstances means that either the needs of the receiving spouse have changed or the ability of the other spouse to pay has

changed. *Anderson*, 409 Ill. App. 3d at 198. The party seeking the modification has the burden to prove that a substantial change in circumstances has occurred. *Id.*

¶ 48　　When a court determines that there has been a substantial change in circumstances, it may modify the maintenance award, but it is not required to do so. *Id.* at 203. Rather, upon determining that there has been a substantial change in circumstances, the court must next weigh the same factors it considered when it made the initial award of maintenance and decide whether and under what terms to modify the award. *Id.* at 203-04. The Act requires consideration of the factors set forth in sections 510(a-5) and 504(a). 750 ILCS 5/504(a), 510(a-5) (West 2018); see also *Blum v. Koster*, 235 Ill. 2d 21, 35-36 (2009).

¶ 49　　A trial court's decision to modify maintenance is reviewed for an abuse of discretion. *Blum*, 235 Ill. 2d at 36. A trial court abuses its discretion when its decision is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the court. *Id.* Further, we defer to the trial court, as the trier of fact, on issues of witness credibility and the weight to be given to the testimony. *Anderson*, 409 Ill. App. 3d at 199.

¶ 50　　　　　　　　　　　　1. Substantial Change in Circumstances

¶ 51　　We first address the trial court's determination that Steven's decrease in income constituted a substantial change in circumstances. In determining that a substantial change occurred, the trial court considered the following. At the time of the original judgment, Steven's annual gross income was $811,000, and it had been in that range for many years. In 2019, Steven's annual gross income was $688,000. However, Steven earned significantly more in the first half of 2019, before the new compensation structure took effect, than in the second half of 2019, after the new compensation structure took effect. Steven's quarterly bonuses during the second half of 2019 were $10,000 and $31,000. In 2020, Steven was guaranteed to earn $416,666, which was comprised of the $250,000

base salary and the bridge payments. In 2021, Steven was guaranteed to earn $250,000, and the bridge payments would terminate. The trial court deemed it unlikely that Steven would receive an annual bonus in the future because, to receive a bonus, Steven would need to increase his sales from the previous year by $2.3 million. Even if Steven were to continue to receive quarterly bonuses in the $30,000 range, instead of the $10,000 range, his total 2020 income would be $536,000 ($416,000 guaranteed, plus 4 x $30,000 quarterly bonus). In 2021, his income would be $370,000 ($250,000, plus 4 x $30,000 quarterly bonus). Thus, the trial court reasonably concluded that, more likely than not, Steven would be unable to accomplish annual gross earnings in the $800,000 range, Steven would instead gross less than the $688,000 he had grossed during the 2019 transition, and there was a significant possibility that Steven's gross earnings would fall to the $400,000 to $600,000 range.

¶ 52   In light of these numbers, we cannot say that the trial court abused its discretion in determining that there was a substantial change in circumstances. Courts have regularly determined that a decrease in income of more than 25% constitutes a substantial change in circumstances. See, *e.g.*, *In re Marriage of Carpenter*, 286 Ill. App. 3d 969, 974 (1997) (the trial court did not abuse its discretion in determining that a decrease in annual income from $70,000 to $50,000 constituted a substantial change, even though the paying spouse had earned more than $100,000 in intervening years); *In re Marriage of Izzo*, 264 Ill. App. 3d 790, 791-92 (1994) (the trial court abused its discretion in determining that a decrease in annual income from $52,000 to $39,000 did not constitute a substantial change).

¶ 53   Toni raises three challenges to the trial court's determination that there was a substantial change in circumstances: (1) the trial court did not hold Steven to his burden of proof, (2) Steven's

evidence was self-serving and speculative, and (3) Steven remained able to satisfy his maintenance obligation despite any decrease in income. These arguments are unavailing.

¶ 54    First, Toni argues throughout her brief that the trial court did not hold Steven to his burden of proof. She cites language from *In re Marriage of Bernay*, 2017 IL App (2d) 160583, ¶ 18, that a petitioner has a "high burden" to prove a substantial change in circumstances. However, in discussing the high burden a petitioner must meet to show a substantial change in circumstances, the *Bernay* court meant only to stress that a change in circumstances must be *substantial* to warrant a modification. The *burden* of proof is not subject to gradation. The *standard* of proof in a civil case is proof by a preponderance of the evidence. See *In re Marriage of Stockton*, 401 Ill. App. 3d 1064, 1069 (2010). A proposition is proved by a preponderance of the evidence if it is proved more likely true than not true. *Id.*

¶ 55    Toni posits, as she did at the clarification hearing, that the trial court could not  say *both* that Steven proved a substantial change in circumstances *and* that the circumstances do not allow for a precise determination of Steven's 2020 and 2021 income. We disagree, and we find no logical inconsistency in the two statements. To determine that, more likely than not, Steven's income substantially decreased, the trial court was not required to arrive at a precise calculation and was not prohibited from fashioning an order that hedges against said decrease. As we will discuss, percentage-based awards, if properly executed, can be appropriate in situations involving fluctuating or uncertain income.

¶ 56    Second, Toni argues that Steven's evidence was speculative and self-serving. She cites *In re Marriage of Sisul*, 234 Ill. App. 3d 1038, 1040 (1992), for the general proposition that an award of maintenance must be made on the basis of the circumstances disclosed by the evidence at the time of the hearing, rather than on speculation. She asserts that two of Steven's exhibits, a

chart entitled "Steve's Future Compensation-Guaranteed" (Exhibit No. 3) and a chart entitled "Sales Applicable to Steve" (Exhibit No. 12), were self-generated and self-serving. This is, essentially, a sufficiency argument.

¶ 57    We disagree that the evidence was insufficient to prove by a preponderance that Steven has suffered a substantial change in circumstances. Exhibit No. 3 was demonstrative evidence that summarized the information contained in Exhibit No. 2, a company document setting forth Steven's new compensation structure. Therefore, while Exhibit No. 3 may have been duplicative, it did not reveal a gap in the evidence. Granted, Exhibit No. 12, listing Steven's annual sales, is corroborated only by Steven's own testimony and is not a company document, as the trial court recognized. However, it is for the trial court to determine the credibility of the witnesses and to assign weight to their testimony. This shortcoming is not fatal, where it is undisputed that Steven's annual gross income has decreased significantly. Toni does not disagree that Steven's income was $811,000 at the time of the MSA. She does not disagree that it was $688,000 in 2019 and that Steven earned at least $90,000 less in the second half of 2019 than in the first half of 2019. The bridge payments are certain to decrease. Although quarterly and annual bonuses remain uncertain, Steven has been through two quarterly bonus cycles since the implementation of the new compensation structure. The amounts of these bonuses also supports the trial court's determination that Steven's income decreased substantially.

¶ 58    Third, Toni argues that Steven remains able to satisfy his maintenance obligation despite any decrease in income. She notes that not every decrease in income constitutes a substantial change in circumstances. *Bernay*, 2017 IL App (2d) 160583, ¶ 18. In *Bernay*, the husband's employment income decreased from $225,000 to $145,000. However, the appellate court determined that there had been no change in the husband's ability to satisfy his $3600 monthly

maintenance payments. *Id.* ¶ 19. In addition to his salary, the husband had a real estate portfolio worth $1.1 million, had $1.4 million in retirement accounts, and expected to inherit approximately $1.9 million from the estates of his recently deceased parents. *Id.* The wife, in contrast, earned $27,000 annually as a nurse, and her investments were considerably less. *Id.* ¶ 12. At the time of the prior modification order, the husband's investment accounts generated $40,000 in annual growth, whereas the wife's investment accounts did not even total $40,000. *Id.* ¶¶ 7-8.

¶ 59 This case is not like *Bernay*. In addition to $145,000 in employment income, the husband in *Bernay* had nearly $4.5 million in assets. With these resources, he could easily satisfy his $3600 monthly support obligation. Steven cannot similarly rely on his assets to satisfy his support obligation. Steven's assets, at just under $1 million, are far less, and his support obligation, at $18,500 per month, is far greater.

¶ 60 Moreover, here, the trial court *did* recognize that not every decrease in income equates to an inability to meet existing payment obligations. The trial court could have ordered the modification retroactive to the date of filing, August 19, 2019. 750 ILCS 5/510(a) (West 2018). However, mindful that Steven grossed $688,000 in 2019, the court did not find Steven unable to satisfy the $18,500 monthly obligation for the remainder of 2019, and it ordered the modification retroactive only to January 1, 2020. The court's determination that Steven proved a substantial change in circumstances was not an abuse of discretion.

¶ 61                    2. The Modification

¶ 62 We next address the modification. Again, when the movant proves a substantial change in circumstances, the court may modify the maintenance amount, but it is not required to do so. *Anderson*, 409 Ill. App. 3d at 203. The court must consider the statutory factors set forth in both

sections 510(a-5) and 504(a) when deciding whether and under what terms to modify maintenance. 750 ILCS 5/504(a), 510(a-5) (West 2018).

¶ 63　We set forth sections 510(a-5) and 504(a) of the Act herein. Section 510(a-5) of the Act provides:

"An order for maintenance may be modified or terminated only upon a showing of a substantial change in circumstances. *** In all such proceedings, as well as in proceedings in which maintenance is being reviewed, *the court shall consider the applicable factors set forth in subsection (a) of Section 504 and the following factors*:

(1) any change in the employment status of either party and whether the change has been made in good faith;

(2) the efforts, if any, made by the party receiving maintenance to become self-supporting, and the reasonableness of the efforts where they are appropriate;

(3) any impairment of the present and future earning capacity of either party;

(4) the tax consequences of the maintenance payments upon the respective economic circumstances of the parties;

(5) the duration of the maintenance payments previously paid (and remaining to be paid) relative to the length of the marriage;

(6) the property, including retirement benefits, awarded to each party under the judgment of dissolution of marriage, judgment of legal separation, or judgment of declaration of invalidity of marriage and the present status of the property;

(7) the increase or decrease in each party's income since the prior judgment or order from which a review, modification, or termination is being sought;

(8) the property acquired and currently owned by each party after the entry of the judgment of dissolution of marriage, judgment of legal separation, or judgment of declaration of invalidity of marriage; and

(9) any other factor that the court expressly finds to be just and equitable." (Emphasis added.) 750 ILCS 5/510(a-5) (West 2018).

¶ 64    Section 504(a), in turn, provides:

"(a) Entitlement to maintenance. In a proceeding for dissolution of marriage, legal separation, declaration of invalidity of marriage, or dissolution of a civil union, a proceeding for maintenance following a legal separation or dissolution of the marriage or civil union by a court which lacked personal jurisdiction over the absent spouse, a proceeding for modification of a previous order for maintenance under Section 510 of this Act, or any proceeding authorized under Section 501 of this Act, the court may grant a maintenance award for either spouse in amounts and for periods of time as the court deems just, without regard to marital misconduct, and the maintenance may be paid from the income or property of the other spouse. The court shall first make a finding as to whether a maintenance award is appropriate, after consideration of all relevant factors, including:

(1) the income and property of each party, including marital property apportioned and non-marital property assigned to the party seeking maintenance as well as all financial obligations imposed on the parties as a result of the dissolution of marriage;

(2) the needs of each party;

(3) the realistic present and future earning capacity of each party;

(4) any impairment of the present and future earning capacity of the party seeking maintenance due to that party devoting time to domestic duties or having forgone or delayed education, training, employment, or career opportunities due to the marriage;

(5) any impairment of the realistic present or future earning capacity of the party against whom maintenance is sought;

(6) the time necessary to enable the party seeking maintenance to acquire appropriate education, training, and employment, and whether that party is able to support himself or herself through appropriate employment;

(6.1) the effect of any parental responsibility arrangements and its effect on a party's ability to seek or maintain employment;

(7) the standard of living established during the marriage;

(8) the duration of the marriage;

(9) the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities, and the needs of each of the parties;

(10) all sources of public and private income including, without limitation, disability and retirement income;

(11) the tax consequences to each party;

(12) contributions and services by the party seeking maintenance to the education, training, career or career potential, or license of the other spouse;

(13) any valid agreement of the parties; and

(14) any other factor that the court expressly finds to be just and equitable."

750 ILCS 5/504(a) (West 2018).

¶ 65    We emphasize that section 510(a-5) provides that both the section 510(a-5) and the section 504(a) factors are to be considered in "all" proceedings involving the modification of maintenance, "as well as" in proceedings for review. 750 ILCS 5/510(a-5) (West 2018). For example, when a maintenance order is up for review, such that the award may be modified without proof of a substantial change and thus there is no substantial-change threshold, the court must consider both the section 510(a-5) and the section 504(a) factors. *Blum*, 235 Ill. 2d at 35-36. The section 510(a-5) factors add value *vis-à-vis* the section 504(a) factors and vice versa.

¶ 66    Here, the record does not support that the trial court considered the requisite statutory factors. Indeed, some aspects of the closing argument and written order suggest the opposite. During closing argument, when Steven referenced the original allocation of assets and each party's respective growth on investment, the court stated:

"I'm just asking is that appropriate for me to even hear the evidence on it and take argument on it where really *I am looking at whether there's been a substantial change in compensation for him, and if so, does—what are the needs of the parties and what capacity does he have to pay*. Isn't that what I am looking at on a petition to modify?" (Emphasis added.)

¶ 67    Similarly, in its order, the court wrote:

"Having concluded that [Steven] met his burden of pro[ving] a substantial change in circumstances, the court must determine whether [Toni] remains in need of maintenance and, if so, [Steven's] capacity to pay moving forward."

¶ 68    This is not the correct analysis, as the court did little more than repeat the substantial-change analysis. Again, a substantial change occurs when the needs of the receiving spouse have changed or the ability of the other spouse to pay has changed. Upon finding a substantial change, the court must then determine whether and on what terms a modification is warranted, *based on the statutory factors* set forth in sections 510(a-5) and 504(a) of the Act. Toni's need, or expenses, and Steven's capacity to pay implicate just a few of the requisite statutory factors.

¶ 69    Similarly, the trial court conducted the hearing in a manner that shows that it did not understand the proper analysis. Twice, it limited the evidence and argument to the issue of Steven's decrease in income. For example, toward the end of his testimony, Steven began to discuss Toni's lifestyle. The court stated that Toni's lifestyle and expenses were relevant only if it granted the petition. The court instructed the parties to remain focused on the alleged substantial change, Steven's decrease in income. This would have been an acceptable evidentiary approach had the court opened the evidence to consider the section 510(a-5) and the section 504(a) factors following its determination that there was a substantial change. Immediately following the denial of Toni's motion for a directed finding on the substantial-change issue, however, the parties proceeded to closing argument. Again, during closing argument, Steven's attorney referenced the original asset allocation and growth on investments. The court questioned the relevance of this information: "I'm just asking is that appropriate for me to even hear the evidence on it and take argument on it." Steven's attorney agreed to "be brief."

¶ 70    In fact, upon finding a substantial change in circumstances, the original allocation of assets and subsequent growth on investments are among the statutory factors that the court should consider. 750 ILCS 5/504(a)(1), (10) (West 2018); 750 ILCS 5/510(a-5)(6), (8) (West 2018). Here, while Toni received just over $1 million in assets under the MSA, a large portion of her award was

tied up in her home of 10 years, a California condominium valued at $735,000. Steven, in contrast, lived in an efficiency studio in rural Illinois valued at $185,000. Steven, who had greater liquid assets, was able to grow the value of his investment accounts by more than $150,000 in one year (2018 to 2019), whereas Toni was able to grow the value of her investment account by just $20,000 in three years (2017 to 2020). Steven no longer pays $35,000 per year in tuition for his daughter. Though these and other factors are relevant when determining the impact of imposing a reduction in cash flow on either party, the record does not suggest that the trial court considered them here. Similarly, it does not appear that the court considered the duration of the maintenance payments previously paid (750 ILCS 5/510(a-5)(5) (West 2018)) or Steven's impending retirement (750 ILCS 5/504(a)(5), (9) (West 2010); 750 ILCS 5/510(a-5)(3) (West 2018)). The court set the maintenance order for review on July 28, 2021, noting only that, at that time, it would have a better understanding of Steven's earned income moving forward. However, at that date, Steven will be just months away from his planned retirement at age 65. It should be noted that, in highlighting some but not all of the statutory factors to be considered, we do not mean to suggest how much weight to give to any of the factors; we mean only to instruct that all the relevant factors must be considered.

¶ 71    In failing to adequately consider the statutory factors, the trial court simply accepted Steven's proposed solution of a purely percentage-based maintenance award. Though not inherently inappropriate, purely percentage-based maintenance awards have been criticized for good reason. *In re Marriage of Waldschmidt*, 241 Ill. App. 3d 7, 12-13 (1993). Relevant here, courts have expressed concern that a purely percentage-based award might enable the trial court to "escape its duty" to consider the statutory factors. *Id.* at 12. Courts have also cautioned that it can be difficult to calculate the specific amount due each month. *Id.* at 13. Moreover, when

imposed by the trial court rather than by the parties' agreement, a percentage-based award might thwart the legislature's intent that the parties prove a substantial change in circumstances prior to a modification. *Id.* at 14-15 (Lund, J., specially concurring) (citing 1 H. Joseph Gitlin, Gitlin on Divorce § 15.12(F), at 359–60 (1991)).

¶ 72     Here, the court's decision to order a purely percentage-based maintenance award might very well result in unjust maintenance payments, a possibility we address to discourage such an occurrence on remand. The court stated that its percentage-based award resulted in a higher payment than if it had issued a guideline amount, $9513 (plus 27.4% of bonuses) versus $7313 monthly. These figures are based on a guaranteed income of $416,666. However, this income was not expected to be constant. Due to the step-down structure of the bridge payments, Steven's monthly salary will be higher in the first half of 2020, resulting in a payment greater than $9513. Steven's monthly salary will be lower in the second half of 2020, resulting in a payment lower than $9513. More problematic, in 2021, Steven's guaranteed income will be $250,000. This allows for the possibility that Toni's maintenance will be $5708 per month (27.4% of $250,000 annually), notwithstanding that the trial court had earlier stated that $7313 per month was too low. Simply put, in cases involving very large decreases in income, percentage adjustments alone can fail to account for the actual needs of the parties.

¶ 73     The better approach, when dealing with fluctuating income, is to bifurcate the award into a guaranteed dollar amount plus a percentage amount. As the *Carpenter* court explained:

> "In setting a *portion* of [the wife's] maintenance payments as a percentage of [the husband's] income, the trial court stated that this was the only way to ensure her a steady stream of income given the fluctuations in [the husband's] income. *** [The wife] notes that[,] in *In re Marriage of Waldschmidt*, [241 Ill. App. 3d 7 (1993)], the [F]ourth [D]istrict

stated in *dicta* that percentage maintenance awards should be discontinued, as they have in the case of child support payments, because they present difficulties in calculating the dollar amount of monthly maintenance payments. \*\*\* [H]owever, maintenance payments based on a single year's income or an average of several years' income also present problems and inherent inequities where the payor spouse's income fluctuates from year to year. In fact, *setting a lower dollar payment and coupling it with a percentage award may be the most reasonable method of handling such situations*." (Emphases added.) *Carpenter*, 286 Ill. App. 3d at 975.

The difference between *Waldschmidt* and *Carpenter*, of course, is that *Waldschmidt* concerned a purely percentage-based award, whereas *Carpenter* concerned a bifurcated award. A well-crafted bifurcated award requires thoughtful consideration of the statutory factors and has the benefit of the recipient receiving a predictable portion of the award without delay, so that he or she can plan a budget.

¶ 74    We acknowledge that, in its written order, the trial court made passing reference to the section 504(a) factors where it held: "Based upon [Toni's] need, [Steven's] capacity to pay[,] *and consideration of the factors set forth in section 504(a)*, ongoing monthly maintenance is appropriate." (Emphasis added). We also acknowledge that the trial court is not required to expressly address each factor. However, for the reasons discussed, we determine that the trial court did not give proper consideration to the appropriate factors. On remand, the court is to consider the statutory factors set forth in sections 510(a-5) and 504(a) when determining whether and under what terms to modify the maintenance award.

¶ 75                                        III. CONCLUSION

¶ 76    For the reasons stated, we affirm the trial court's determination that there was a substantial change in circumstances. However, we remand for the court to reconsider the maintenance award upon consideration of the statutory factors.

¶ 77    Affirmed in part and vacated in part.

¶ 78    Cause remanded.

---

**No. 2-20-0268**

---

| | |
|---|---|
| **Cite as:** | *In re Marriage of Osseck*, 2021 IL App (2d) 200268 |

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Boone County, No. 16-D-31; the Hon. Ronald A. Barch, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | Paulette M. Gray, of Gray & Gray LLC, of Crystal Lake, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | James T. Zuba, of Zuba & Associates, P.C., of Rockford, for appellee. |

---