2026 IL App (2d) 250044-U
No. 2-25-0044
Order filed April 1, 2026

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

*In re* THE MARRIAGE OF LYNN D. BERNAY, Petitioner-Appellee,

and

JERRY S. BERNAY, Respondent-Appellant.

Appeal from the Circuit Court of Lake County.
Honorable Stephen DeRue, Judge, Presiding.
No. 92-D-2420

JUSTICE HUTCHINSON delivered the judgment of the court.
Justices McLaren and Jorgensen concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The trial court did not err when it (1) determined payor spouse failed to make a *prima facie* case of a substantial change in circumstances to terminate maintenance; (2) denied the petition for discovery sanctions; and (3) ordered contribution to attorney fees.

¶ 2    Respondent, Jerry S. Bernay, appeals from the denial of his petition to terminate monthly maintenance payments to his former wife, Lynn D. Bernay. Jerry also appeals the denial of his petition for sanctions and the court's order that he contribute to Lynn's attorney fees. We affirm.

¶ 3    This is the third time this matter has been before us on the issue of post-dissolution maintenance under the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/101 *et*

*seq.* (West 1994)). For context, the parties were married in Colorado in 1978 but soon moved to Illinois and raised their three children here. Jerry was employed through his family's business, a debt-collection agency, while Lynn was a stay-at-home mother. In 1992, Lynn petitioned for dissolution. That year, she also began pursuing a career as a registered nurse.

¶ 4　　In 1995, judgment was entered dissolving the parties' marriage. As part of the judgment, Lynn received $4,150 per month in unallocated maintenance and child support. This award was reviewable after 36 months. In 1999, after a hearing, the court (Judge Emilio B. Santi) increased Lynn's unallocated award to $6000 per month, reviewable after 60 months.

¶ 5　　In 2003, Lynn moved back to Colorado. The following year, she petitioned for an extension of maintenance. At this time the parties were in their fifties. In light of the significant disparity in the parties' earnings and earning potential, in March 2006, the trial court (Judge Diane E. Winter) ordered Jerry to pay Lynn permanent maintenance—that is, spousal support terminable only in the event of the either party's death or Lynn's remarriage—of $3600 per month. In its order, the court noted that, during the marriage, "the parties enjoyed a comfortable lifestyle, which included travel and vacations, Bulls, Cubs and Blackhawk[s] games, concerts, weekly dinners out family and friends and owning and maintaining a horse." The court found that Lynn's lifestyle as a nurse in Colorado was much more modest than the standard of living during the marriage. Meanwhile, Jerry had remarried. He continued to draw a sizeable salary, he possessed nearly $2 million in personal assets, and many of his expenses were offset by his new spouse's financial contributions.

¶ 6　　Jerry appealed the judgment that ordered permanent maintenance and we affirmed. See *In re Marriage of Bernay*, No. 2-06-0697 (2007) (unpublished order under Supreme Court Rule 23) (*Bernay I*). Relevant here, in our decision, we specifically addressed the standard of living achieved during the marriage, and stated:

"In the three years prior to their separation in 1992, the family vacationed in Seattle, San Francisco, St. Thomas, Cozumel, Steamboat Springs, Denver, New York, Miami, and Boca Raton. The parties owned a horse that they boarded with a third party, and [Lynn] took riding lessons. Additionally, the parties had an interest in season tickets for the Bulls, attended Blackhawks and Cubs games several times each season, had memberships to health clubs, dined out several times a week, hosted parties at their home, and attended concerts, museums, and movies on a regular basis." *Id.* at 3.

We noted that Jerry continued to have assets to support himself as well as to support Lynn. *Id.*

¶ 7    In 2014, Jerry petitioned to terminate Lynn's maintenance. After a hearing, the trial court (Judge Joseph V. Salvi) granted the petition. The court found that there had been a substantial change in circumstances due to Jerry's illness (he was diagnosed with lymphoma), a claimed reduction in his salary, and his upcoming retirement. The court also chided Lynn for not becoming financially self-sufficient, for not relocating to a potentially more lucrative job market near a larger city in Colorado, and for not electing to draw on her Social Security early, at the age of 62.

¶ 8    Lynn appealed and we reversed the order terminating her maintenance. *In re Marriage of Bernay*, 2017 IL App (2d) 160583 (*Bernay II*). Specifically, we determined that the trial court misconstrued the Act and the 2006 judgment and, therefore, abused its discretion. *Id.* ¶ 13. As we explained, little had actually changed for the parties since our decision in *Bernay I*, and "[a]n award of permanent maintenance should not be lightly terminated." *Bernay II*, 2017 IL App (2d) 160583, ¶ 21. We noted that the parties had been in their mid-fifties in 2006, and their "finances and not-to-distant retirement plans were directly at issue" when Judge Winter ordered permanent maintenance. *Id.* ¶ 18. Furthermore, the 2016 hearing showed that Jerry continued to have multiple sources of income and multiple residences. The evidence also showed that Lynn had reasonable

financial needs, that she was living below the standard of living established during the marriage, and that Jerry had sufficient resources to continue to meet both of their needs. *Id.* ¶¶ 13-14, 17-23. We reversed the order terminating maintenance and remanded for a determination of the arrearage. *Id.* ¶ 24. Our supreme court denied leave to appeal. *In re Marriage of Bernay*, No. 122979 (March 21, 2018). That brings us to the present matter.

¶ 9 The parties are now in their seventies and have both retired. In September 2022, Jerry filed a renewed petition to terminate Lynn's $3,600 monthly maintenance. During the discovery phase of the litigation, Jerry also filed a petition for sanctions. Lynn, meanwhile, filed a petition ordering Jerry to contribute to her attorney fees. The trial court (Judge Stephen DeRue), held a combined hearing on all three matters over four court dates in the summer of 2024. On December 27, 2024, the court entered a detailed 23-page memorandum judgment, which (1) denied Jerry's petition to terminate maintenance, (2) denied Jerry's request for discovery sanctions, and (3) granted Lynn's petition for contribution. Jerry has timely appealed, and we discuss the evidence and the findings in greater detail below.

¶ 10 On appeal, Jerry contends that we should reverse the trial court on all three issues— maintenance, sanctions, and contribution. We find no error in the trial court's judgment.

¶ 11 We first address Jerry's contention that the trial court erred when it found that he had not made a *prima facie* case to terminate Lynn's maintenance. An order of maintenance may be modified only upon a showing of a substantial change in circumstances since the most recent award. 750 ILCS 5/510(a-5) (West 2018); *In re Marriage of Anderson*, 409 Ill. App. 3d 191, 198-99, (2011). A substantial change in circumstances means that either the needs of the receiving spouse have changed or the ability of the other spouse to pay has changed. *Anderson*, 409 Ill. App. 3d at 198. The party seeking the modification has the burden to prove that a substantial change in

circumstances has occurred. *In re Marriage of Osseck*, 2021 IL App (2d) 200268, ¶ 47; see also *Bernay II*, 2017 IL App (2d) 160583, ¶ 18. We review a trial court's decision to modify maintenance, or to *not* modify maintenance, for an abuse of discretion. *Blum v. Koster*, 235 Ill. 2d 21, 35-36 (2009). A trial court abuses its discretion when its decision is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the court. *Id.* Further, we defer to the trial court, as the trier of fact, on issues of witness credibility and the weight to be given to the testimony. *Osseck*, 2021 IL App (2d) 200268, ¶ 49. While a substantial change in circumstances need only be proved by a preponderance of the evidence (*id*. ¶ 54), the petitioner must prove that a change is truly substantial to warrant modification (*Bernay II*, 2017 IL App (2d) 160583, ¶ 18).

¶ 12    Here, the trial court found that Jerry failed to show a *prima facie* case of a substantial change in circumstances, and that determination was not unreasonable. When we compare the evidence of Jerry's financial profile from the 2016 hearing to the 2024 hearing, it is apparent that he has gone from strength to strength. The most recent evidence revealed that Jerry's income is approximately $15,200 per month (or $183,000 per year) from Social Security and required IRA distributions, while Jerry's monthly expenses were approximately $9,600. Jerry testified that he pays his $3,600 monthly maintenance obligation to Lynn with funds from a trust, and not out of his monthly income. Jerry has approximately $1.6 million on hand between his trust account, a brokerage account, and his checking account. Jerry's IRAs have a combined value of roughly $2.3 million. There is also Jerry's real estate portfolio. Jerry and his wife Paula own a home in Sanibel, Florida, valued at over $1 million, a condo in downtown Chicago valued at $260,000, and a home in Stockbridge, Massachusetts, valued at $550,000. The properties' combined value is $1.8 million. The properties are owned outright by the couple's various trusts; none are mortgaged.

Accordingly, the court valued Jerry's real and personal assets at approximately $5.7 million. At the hearing, Jerry noted that he gave one of the parties' daughters a $75,000 gift to purchase a home and recently financed travel for roughly a dozen family members to vacation in Playa del Carmen, Mexico.

¶ 13    Lynn's finances were much less robust. At 73, she receives around $1,600 monthly from Social Security. Lynn's maintenance is tax-deductible by Jerry but is taxable to Lynn as income. So, with taxes taken out, Lynn receives approximately $3,000 per month in maintenance. Lynn's principal asset is her home in Boulder, Colorado, where she resides alone. The trial court noted that the 1,100-square-foot home was rather modest. Lynn purchased the home in 2005 for $329,000 and used money from her father ($75,000) as a down payment. At the hearing, the parties stipulated that the home's present value is $920,000, with approximately $189,000 owed on the mortgage. Lynn's monthly household and personal expenses are approximately $3,700 per month, which includes her $1,800 mortgage payment.

¶ 14    Evidence showed that Lynn's had around $4,000 in her checking account and $20 in her savings account. Lynn previously had approximately $40,000 in a retirement account, but she was forced to liquidate that account to pay her expenses when her maintenance was terminated by the trial court in 2016. After the remand following our decision in *Bernay II*, Lynn received a check from Jerry for roughly $90,000 in maintenance arrears. As of the 2024 hearing, around $4,000 remained in the investment account where Lynn had deposited the check. Lynn therefore has roughly $8,000 on deposit.

¶ 15    Lynn is on her daughter's cell phone plan. She has been driving the same vehicle for nearly 20 years, a 2003 Nissan Xterra, with approximately 105,000 miles on it. Lynn has kept up with the registration for her nursing license; however, she stated that she was forced to retire due to

severe arthritis in her hands. (The trial court found that both parties had retired in good faith. Jerry does not contest that finding.) Lynn has no credit card debt, but owes her daughter approximately $8,400 for attorney fees, phone bills, airline tickets, and home repairs. Consequently, the trial court found credible Lynn's testimony that she could not afford certain activities she previously enjoyed during the marriage, like "attending sporting events, going out to eat weekly with family or friends, owning and maintaining a horse or other pets, going to concerts, and taking [frequent] vacations ***." The court also noted that, "[i]t is clear that Lynn, even receiving maintenance from Jerry, is not living the lifestyle anywhere near the standard of living of the parties during the marriage."

¶ 16    As for Lynn's other assets, her father previously gifted her a one-third interest in four vacant parcels of land in New Marlborough, Massachusetts. Lynn's father purchased the property in the early 1970s, and it has not been inspected or appraised. Lynn testified that she has never been to the property and has never paid for any of its expenses. The parties stipulated that the land had a present value of $22,000. This asset was discussed during 2015 hearings.

¶ 17    Evidence also showed that in 2009, Lynn's parents conveyed to Lynn an interest in her parents' townhouse in Miami, Florida. Lynn held that interest in joint tenancy, with right of survivorship, along with her parents and two siblings. Lynn testified that she never regarded the property as hers; she never paid for her interest in it, she never resided in the townhouse, and she never paid for any of its expenses. Lynn quitclaimed her interest in the property in 2021. After Lynn's parents had passed, her siblings subsequently sold the townhouse for $570,000. The trial court noted that, despite an extensive discovery inquiry, there was no evidence Lynn ever received *any* portion of the proceeds. The trial court found Lynn's testimony not credible that she did not know much about the disposition of the property. Nevertheless, the court noted that even if Lynn *had* received a share of the proceeds, it would *not* alter the court's analysis on the termination of

maintenance.

¶ 18    In addition, after Lynn's father passed away, she did not receive an inheritance. Her siblings, however, did. Lynn testified that after her father passed in April 2023, her siblings determined she should receive some artwork and furniture her parents had purchased, which was located in the townhouse in Miami. Lynn testified that the artwork has not been appraised but was insured for approximately $125,000. (The State Farm policy indicates there were 24 pieces of artwork. About half of the collection is made up of paintings by modernist Walter Friedman. See https://www.artsy.net/artist/warner-friedman (last visited Mar. 19, 2026).)

¶ 19    In its memorandum judgment, the trial court noted that the Lynn's primary financial asset was her house, which had appreciated in value, but was still mortgaged. The trial court rejected Jerry's attorneys' insistence that Lynn should sell her residence. The court found it would be inequitable to suggest that Lynn should sell the home she had lived in for the last 20 years. Again, the court noted the prior findings regarding the standard of living during the marriage, "and that at present, Lynn does not appear to be enjoying a lifestyle anywhere near [that] standard of living."

¶ 20    Jerry contends that the trial court's decision was against the manifest weight of the evidence and an abuse of discretion because of Lynn's "historical pattern of dishonesty that renders her entire testimony inherently improbable and wholly unbelievable." (Capitalization altered.) According to Jerry's brief, the trial court abused its discretion when it failed to impute some portion of the sale price of Lynn's parent's townhouse, the insured value of the art collection, and the increased value of Lynn's home in Colorado. He goes further with respect to Lynn's home and suggests she could simply reverse mortgage the property to "leverage the exponential growth in [its] equity ***." This, according to Jerry, meant that Lynn had *hundreds of thousands* of dollars

- 8 -

at her fingertips, and no longer had need of Jerry's $3,600 monthly maintenance payment. Like the trial court, we find Jerry's arguments misguided and unpersuasive.

¶ 21    As we said in *Bernay II*, when a party seeks to terminate or reduce permanent maintenance, party must show either that the former spouse's needs have decreased or that the payor spouse is no longer able to pay maintenance as ordered. *Bernay II*, 2017 IL App (2d) 160583, ¶ 18 (citing *Anderson*, 409 Ill. App. 3d at 198). We are of course familiar with case law suggesting that a *decrease* in the payor spouse's income of 25% or more constitutes a substantial change in circumstances. See, *e.g.*, *Osseck*, 2021 IL App (2d) 200268, ¶ 52; *In re Marriage of Carpenter*, 286 Ill. App. 3d 969, 974 (1997); *In re Marriage of Izzo*, 264 Ill. App. 3d 790, 791-92 (1994). What we are unable to find, and what certainly has not presented to us, is *any* authority for the proposition Jerry would have us hold here: that a trial court abuses its discretion by *not* finding a substantial change in circumstances when the payor's income and resources have *increased*. In *Osseck*, for example, the husband's income went down significantly, and the trial court found that a reduction in monthly maintenance (originally set at $18,500) was necessary. *Osseck*, 2021 IL App (2d) 200268, ¶¶ 58-60. In that case, we distinguished the circumstances from *Bernay II* and explained that "[i]n addition to $145,000 in employment income, the husband in *Bernay [II]* had nearly $4.5 million in assets. With these resources, he could easily satisfy his $3600 monthly support obligation." *Osseck*, 2021 IL App (2d) 200268, ¶ 59. So far, all that has changed since *Bernay II* is that, in retirement, Jerry's yearly income *increased* to roughly $180,000 and he now has $5.7 million in assets. In other words, Jerry can "easily" continue to "satisfy his $3600 monthly support obligation."

¶ 22    To the extent Jerry's arguments are meant to show that Lynn experienced a substantial change in circumstances, they failed in that endeavor as well. To begin with, we know of no

authority (and Jerry again cites none) that requires a dependent former spouse to sell, or reverse mortgage, her home, or to sell personal property she received as an inheritance (the artwork) before she can continue to receive court-ordered permanent maintenance. With respect to the artwork, Jerry has not shown marketability, or what these pieces of art are truly worth, which may deviate significantly from the values used to set terms in an insurance policy. But even if we assumed that the artwork was worth $125,000, and that Lynn could sell it for that amount, the picture that has been painted of Lynn's finances would look much the same. That is, even if we granted Jerry's position that Lynn was "wholly" incredible, there was never *any* dispute about her monthly income and expenses. True, $125,000 might improve Lynn's quality of life, or offset some of her expenses, but not for very long, as the trial court found. The trial court also determined that even if Lynn somehow had an interest in her parent's townhouse in Miami, that amount of money, too, would be trivial in the context of maintenance. It certainly would not be enough to restore Lynn to the standard of living achieved during the marriage and *that* is the principal issue, just as it was in *Bernay II*.

¶ 23 Again, a dependent former spouse is *not* " ' "required to lower the standard of living established in the marriage as long as the payor spouse has sufficient assets to meet his needs and the needs of his former spouse." ' " *Bernay II*, 2017 IL App (2d) 160583, ¶ 17 (quoting *In re Marriage of Shen*, 2015 IL App (1st) 130733, ¶ 87 (quoting *In re Marriage of Walker*, 386 Ill. App. 3d 1034, 1044 (2008))). In short, nothing substantial has changed for the parties since our decision in *Bernay II* almost a decade ago. Lynn still has reasonable financial needs, and Jerry still has sufficient income to support her consistent with Judge Winter's 2006 maintenance order. Furthermore, the record is clear that Lynn's present standard of living, even with permanent maintenance, is significantly below her standard of living during her marriage to Jerry. We agree

with the trial court that Jerry failed to make a *prima facie* case of a substantial change in circumstances. In our view, the trial court's findings were thorough, detailed, and reasonable; they were not an abuse of discretion, and they were not against the manifest weight of the evidence.

¶ 24 Next, we address sanctions. In the trial court, Jerry sought sanctions for Lynn's failure to previously disclose her 2009-2021 interest in the Miami townhouse, the precise value of her home in Boulder, the precise value of the artwork, and the precise value of her interest in the vacant land in Massachusetts. The trial court expressed some skepticism on those points, indicating that it did not believe Lynn was completely unaware of those valuations. However, the court found something akin to unclean hands in Jerry's motion for sanctions. The court noted that Jerry in his initial financial affidavits in 2022 failed to disclose "anything about [his] Chicago Condo as well as the Sanibel property which *** he transferred into his current wife's trust [in 2017]." The court found that, whatever the situation with the trusts, the properties were clearly Jerry's assets, which *he* failed to disclose. With that, the court denied Jerry's request for sanctions in its entirety.

¶ 25 We likewise find that the trial court did not abuse its discretion when it denied Jerry's motion for sanctions. Jerry's attorneys argue that the structure of his and Paula's revocable trusts dictated that he holds a mere "expectancy interest" in the Sanibel and Chicago properties, and therefore he "had ***no*** obligation to disclose this ***non-asset***" (emphasis in original) in his initial financial affidavits. Jerry's assertion is beside the point. The purpose of imposing discovery sanctions at all "is to coerce compliance with discovery rules and orders, not to punish the dilatory party. [Citations.]" *Shimanovsky v. General Motors Corp.*, 181 Ill. 2d 112, 123 (1998). Jerry did not claim that Lynn was in possession of any evidence or information that she had failed to disclose, especially by the time of trial. The trial court properly found that there was no need to

use indirect civil contempt to compel Lynn to produce evidence, especially evidence that Jerry failed to show existed in the first place or was in Lynn's possession.

¶ 26 The final matter is Jerry's contention that the trial court abused its discretion in ordering him to contribute $55,000 towards the $81,000 Lynn incurred in attorney fees since our decision in *Bernay II*. The trial court found that the parties' financial disparities made it appropriate that Jerry should make such a contribution. The court further noted that Jerry was the movant who initiated this most recent round of litigation, that he was primarily responsible for its scope and duration, and that Lynn, who was clearly the prevailing party, did not have adequate financial resources to pay her attorney fees. 750 ILCS 5/508(a)(2), (b) (West 2022). Here, too, we find no abuse of the court's discretion. See *In re Marriage of Heroy*, 2017 IL 120205, ¶¶ 19, 22. Despite Jerry's argument to the contrary, the trial court's findings were amply justified by the record and the court did not err in ordering Jerry's contribution.

¶ 27 Having carefully considered the record, and the parties' arguments, we agree with the trial court's findings that: (1) Jerry did not make a *prima facia* showing of a substantial change in circumstances; (2) indirect civil contempt would serve no purpose, especially after the hearing had already been held; and (3) Jerry's $55,000 contribution to attorney fees was reasonable to level the playing field for both parties. The 2006 maintenance order remains in effect, and the judgment of the circuit court of Lake County is affirmed.

¶ 28 Affirmed.