NOTICE
This Order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2023 IL App (4th) 220994-U

NO. 4-22-0994

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
October 23, 2023
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the |
| DIANE CHERRY, | ) | Circuit Court of |
|     Petitioner-Appellant and Cross-Appellee, | ) | Sangamon County |
|     and | ) | No. 15D538 |
| ANDREW CHERRY, | ) | |
|     Respondent-Appellee and | ) | Honorable |
|     Cross-Appellant. | ) | Matthew Maurer, |
| | ) | Judge Presiding. |

JUSTICE HARRIS delivered the judgment of the court.
Justices Zenoff and Lannerd concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The appellate court affirmed, holding that (1) modification of respondent's maintenance award was not required under the terms of the dissolution judgment and (2) the trial court did not err in denying respondent's motion to modify maintenance after considering the requisite statutory factors.

¶ 2    Respondent, Andrew Cherry, cross-appeals the trial court's order denying his motion to modify his maintenance obligation to petitioner and cross-appellee, Diane Cherry. Respondent argues the court erred in ruling that modification of maintenance was not warranted where evidence was presented that petitioner had obtained employment and the parties' judgment of dissolution of marriage stated that a change in petitioner's employment would constitute a "substantial change in circumstances warranting a modification of [respondent's] maintenance obligation." Respondent also argues the court erred by ignoring evidence relating to

statutory factors it was required to consider in determining whether to modify the maintenance award. We affirm.

¶ 3                              I. BACKGROUND

¶ 4          On September 3, 2015, petitioner filed a petition for dissolution of the parties' 18-year marriage. On June 8, 2016, the trial court entered a judgment of dissolution of marriage pursuant to which respondent was to pay maintenance to petitioner in the amount of $1560 per month for a period of 14.62 years. In relevant part, the judgment stated: "The parties agree that [petitioner] must provide notice to [respondent] within seven (7) days of obtaining employment. A change in [petitioner's] employment shall be considered a substantial change in circumstances warranting a modification of [respondent's] maintenance obligation. [Petitioner] has an obligation to obtain employment."

¶ 5          On March 1, 2022, respondent filed a motion to modify maintenance, in which he asserted there had been substantial changes in the parties' financial circumstances since the dissolution judgment was entered. Specifically, respondent alleged petitioner had obtained employment and respondent had been laid off from his job as a union ironworker due to an ankle injury and was receiving unemployment income.

¶ 6          On August 5, 2022, and September 12, 2022, a hearing was held on respondent's motion to modify maintenance, as well as several other pending motions that are not at issue in this appeal. Respondent was represented by counsel at the hearing, and petitioner was self-represented. Beverly Marshall, respondent's wife, testified respondent injured his leg in November 2021 and had surgery as a result. Marshall indicated that respondent still had "pain surges" in his leg randomly and he walked "a little different" than before the injury. Marshall testified that she owned the house where she and respondent lived and she paid the mortgage and

bills related to the house. Marshall stated that respondent purchased a pickup truck in February 2021 while he was laid off from work.

¶ 7 Respondent testified that he was 57 years old and was previously a union ironworker. In November 2021, he sustained a fracture to a bone in his lower leg near the ankle while he was at home. He described it as a "spiral fracture of the left fibula." Respondent stated he had surgery to repair the fracture. Respondent identified an exhibit as photographs he had taken at his doctor's office of X-rays displayed on computer monitors. Respondent indicated the X-rays showed his ankle after his surgery, which contained nine screws, a steel strap, a washer, and a posttensioning cable. The trial court *sua sponte* ruled it would not allow respondent to testify as to "specific medical things." The court stated: "For him to say he broke it and those types of things, I understand. But to get into the specifics and leg straps and the bolts or the specific screws, I'm not going to allow that." The court refused to admit the photographs of the X-rays. Respondent testified that, after the surgery, he used a walker and crutches for a few weeks. He indicated he had not used assistive devices to walk since the end of February 2022.

¶ 8 Respondent stated he had not worked since his injury. Two letters from respondent's medical providers were admitted into evidence. One letter, dated February 2, 2022, stated respondent was permitted to return to work with the following restrictions: 30 minutes per hour of standing or walking, no lifting or carrying of more than 40 pounds, and no kneeling. The second letter, dated March 15, 2022, stated respondent was permitted to return to work with the following restrictions: 40 minutes per hour of standing or walking, no lifting of more than 50 pounds, and limited kneeling. Respondent indicated he had not returned to his medical providers for further evaluation since March 2022.

¶ 9    Respondent testified that as a union ironworker, he was required to climb ladders, traverse uneven ground, and wear an 80-pound harness. He had to be able to carry items weighing more than 50 pounds and was required to be on his feet all day. He stated that although he had been released to return to work with restrictions, he was unable to perform the job of a union ironworker with the restrictions imposed by his medical providers. Respondent stated he registered with his union hall as being available to work in spring 2022, but he did not receive any calls. He did not seek any work outside of his union hall. In addition to his ankle injury, respondent indicated he had chronic obstructive pulmonary disease, arthritis in his hands, and had undergone surgery in 2009 after he "broke [his] neck."

¶ 10    Respondent indicated he had considered applying for disability benefits but chose not to because he learned he would be better off financially if he retired instead. Respondent retired from the union hall in July 2022 and began receiving a pension of $2524 per month. He indicated his pension was currently his only source of income and it did not cover his monthly expenses. He stated he had a retirement annuity fund containing approximately $100,000, but he was not able to access it until he was 59.5 years old.

¶ 11    Respondent testified that he took out a loan in January 2022 to pay maintenance and child support because he was only receiving unemployment benefits at the time and had no other means of paying his support obligations. He stopped receiving unemployment benefits in May 2022, and he had no income until he started receiving pension payments in July. An exhibit in the form of a chart was admitted into evidence that purportedly showed that petitioner had received more income than respondent since November 2021 based on deposits made to their respective bank accounts. This exhibit also contained petitioner's bank records from November 2021 through May 2022 and respondent's bank records from November 2021 through July 2022.

Respondent testified he earned approximately $90,000 in 2017; $60,000 in 2018; $46,000 in 2019; $68,000 in 2020; and $70,000 in 2021.

¶ 12         The trial court admitted into evidence two financial affidavits prepared by respondent. One of the affidavits, which was prepared in January 2022, included several of respondent's income tax returns and bank statements. The more recent financial affidavit, which was prepared in August 2022, indicated respondent received pension payments in the amount of $2524 per month, had a life insurance policy with a face value of $9000, and had a retirement annuity fund with a balance of approximately $100,000. It also reflected living expenses of $2939 per month, including $67 for phone expenses; $1350 for groceries, household supplies, and toiletries; $1049 for his car payment, insurance, gas, and other related expenses; $343 for personal expenses; and $130 for expenses related to his minor and dependent children. The affidavit indicated respondent owed $37,250 on an automobile loan, $2933 for attorney fees; $2500 for a credit card balance, and $2400 for a loan he had taken out to pay child support and maintenance. His monthly debt payments totaled $1187.

¶ 13         Petitioner, appearing *pro se*, testified that she was 56 years old and was not currently caring for any minor children. She indicated the parties' daughter was 18 years old, attending college, and no longer living with her. Petitioner testified that she had applied for work after the dissolution, but she had only been able to find part-time work as a brand ambassador for alcohol brands, including Bacardi, Flow Wine Group, and Samplers, Inc. She indicated she tried to "float" with as many companies as possible to get as many hours as she could. She worked two to seven hours per week and earned an average of approximately $1100 per month. In discussing her (presumably weekly) employment income, she stated: "I tried to average it out about approximately 275. It can be under 275 or it can be over." She indicated her most recent

paycheck from Samplers was $76 because she had only one shift in two weeks. At other times, she could have three shifts in a day. She stated it was "very hard" to determine her average income because hours were sporadic, but she "did the best [she] could to guess." She stated she had been working as a brand ambassador for approximately five years.

¶ 14 Petitioner's previously admitted bank records showed, excluding support payments from respondent and deposits that were clearly not income from employment (*e.g.*, tax refunds), her monthly deposits ranged from approximately $1000 to approximately $2600. Some of these deposits came from Samplers. The Samplers deposits ranged from approximately $230 to $1730 per month. Many of the other deposits were marked only "deposit," and their source was unclear. These deposits ranged from approximately $100 to approximately $2000 per month.

¶ 15 Petitioner indicated she had applied for numerous part-time and full-time jobs following the dissolution but only received offers for the brand ambassador positions. She stated she continued to apply for "better work." She indicated she had recently applied for a full-time job at Helzberg Diamonds but had not received any response. Over the years, she had applied for jobs as a liquor manager at a grocery store, a court advocate supervisor, a 911 operator, and a building permit assistant. Petitioner indicated she had sales experience as a brand ambassador, had worked as a cashier, and was able to type.

¶ 16 Petitioner testified she also ran a small business selling items online. However, she did not have enough money to invest in the business to "really get it going," and it operated at a loss. She acknowledged she had failed to tender the bank records for her business account to respondent in discovery but indicated there was "nothing in it."

¶ 17 When asked by the trial court, petitioner indicated she did not possess an advanced degree. She stated she had not pursued higher education after the dissolution because

she could not afford to do so. She stated she lacked skills and had been a stay-at-home parent to the parties' daughter during the marriage.

¶ 18　　　　The trial court admitted into evidence petitioner's financial affidavit, which was dated May 16, 2022. The affidavit indicated petitioner's gross monthly income was $2824, which included $1100 from employment, $1293 in maintenance payments, and $431 in child support payments. She reported monthly living expenses totaling $3032. According to the evidence, petitioner owned a residence valued at approximately $100,000 and owed about $71,000 on her mortgage. She stated there were also two liens placed on the residence: one by a credit card company in the amount of approximately $11,000 and one by her sister in the amount of $25,000. On her financial affidavit, petitioner reported other debts totaling approximately $36,000, including a car payment, taxes, unpaid utility bills, and credit card balances. She testified she did not have any savings or retirement funds.

¶ 19　　　　The parties submitted written closing arguments. In his written argument, respondent asserted his maintenance obligation should be reduced or terminated based on his injury and subsequent retirement, which he asserted constituted a substantial change in circumstances. Respondent also argued that, pursuant to the dissolution judgment, petitioner's employment constituted a substantial change in circumstances and would be a "basis to modify."

¶ 20　　　　On October 12, 2022, the trial court entered a written order denying respondent's request for a modification of his maintenance obligation. The court found that, although there had been a substantial change in circumstances, modification was not warranted based on the evidence, statutory factors, and credibility of the witnesses. The court found respondent was not a credible witness and did not present "any credible evidence" that he was disabled or was no longer able to work due to his ankle injury. The court stated respondent provided "very limited

and selective medical evidence," noting the most recent documentation he provided regarding his injury was a progress note from March 2022 allowing him to return to work with fewer restrictions than he had the month before. The court found this showed respondent's condition was improving and he was able to work. The court noted respondent never sought disability benefits. The court found respondent's retirement was voluntary and was an attempt to evade his maintenance obligation.

¶ 21  The trial court further found petitioner was a stay-at-home parent during the marriage and had no advanced degrees or marketable skills. The court noted petitioner had applied for jobs after the divorce but had only found part-time work. The court found petitioner's efforts to obtain employment were in good faith and reasonable under the circumstances. The court noted petitioner's debts had increased and found she was unable to meet her current needs. The court stated respondent was able to meet his needs, noting he lived with his wife in her home and had purchased a pickup truck while unemployed. The court noted in its order that the parties' daughter had recently turned 18 and was emancipated. The court's order also decided several other pending motions, which are not at issue in this appeal.

¶ 22  Petitioner appealed, and respondent cross-appealed. Petitioner's appeal was subsequently dismissed for failure to file a brief, but respondent's cross-appeal remains at issue.

¶ 23                II. ANALYSIS

¶ 24  On appeal, respondent argues the trial court erred in ruling that modification of maintenance was not warranted where the dissolution judgment stated that a change in petitioner's employment would constitute a "substantial change in circumstances warranting a modification of [respondent's] maintenance obligation." Respondent also argues the court erred

by ignoring certain evidence and placing undue weight on other evidence relating to statutory factors it was required to consider in determining whether to modify the maintenance award.

¶ 25                              A. Terms of the Dissolution Judgment

¶ 26        Respondent argues the trial court erred because modification was required under the plain language of the dissolution judgment. Respondent notes the dissolution judgment provided that "[a] change in [petitioner's] employment shall be considered a substantial change in circumstances warranting a modification of [respondent's] maintenance obligation." According to respondent, once a change in petitioner's employment occurred, the language of the judgment made the modification of maintenance mandatory.

¶ 27        Under the typical statutory procedure for the modification of maintenance, the moving party must first establish that a substantial change in circumstances has occurred. 750 ILCS 5/510(a-5) (West 2022). "When a court determines that there has been a substantial change in circumstances, it may modify the maintenance award, but it is not required to do so." *In re Marriage of Osseck*, 2021 IL App (2d) 200268, ¶ 48. Rather, the trial court must then weigh the factors set forth in sections 504(a) and 510(a-5) of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/504(a), 510(a-5) (West 2022)) and determine whether to modify the award. *Osseck*, 2021 IL App (2d) 200268, ¶ 48.

¶ 28        However, "[w]here the parties agree to the terms under which maintenance may be modified or terminated, their terms (incorporated into the judgment) take precedence over the provisions for modification and termination as set forth in section 510 of the Act." *In re Marriage of Brent*, 263 Ill. App. 3d 916, 922-23 (1994). "The provisions of marital settlement agreements and of dissolution judgments which incorporate such agreements are interpreted under the same rules governing the construction of contracts." *In re Marriage of Druss*, 226 Ill.

App. 3d 470, 475 (1992). "A court is required to construe the provisions within dissolution judgments and settlement agreements so as to give effect to the intention of the parties, and where the terms are unambiguous, the parties' intent must be determined solely from the language of the instrument itself." *Id.*; see *In re Marriage of Mulry*, 314 Ill. App. 3d 756, 758 (2000). Ambiguity in the terms of a dissolution judgment or marital settlement agreement exists "where the language is reasonably susceptible to more than one meaning." *Druss*, 226 Ill. App. 3d at 476. As the interpretation of a contract is a question of law, our review is *de novo*. *Mulry*, 314 Ill. App. 3d at 758; *In re Marriage of Wassom*, 352 Ill. App. 3d 327, 330 (2004).

¶ 29        Here, we find the maintenance language of the dissolution judgment highlighted by respondent is ambiguous. It is not clear from the plain language of the judgment whether the parties intended that a change in petitioner's employment would automatically necessitate a modification of maintenance, as respondent claims, or whether, as the trial court appears to have found, it would simply constitute a "substantial change in circumstances," which would allow a movant to then argue the statutory factors favored a modification. Although either interpretation is arguable, thus making it ambiguous, we find the trial court's interpretation of the dissolution judgment is the more reasonable one. If we were to construe the dissolution judgment as respondent does, it would mean that any "change in [petitioner's] employment" would automatically necessitate a modification of maintenance, no matter whether an analysis of the many statutory factors would indicate otherwise. See *Foxfield Realty, Inc. v. Kubala*, 287 Ill. App. 3d 519, 524 (1997) ("Courts will construe a contract reasonably to avoid absurd results."). We also note that ambiguities in the terms of a contract or marital settlement agreement are typically construed against the drafter. *In re Marriage of Kuyk*, 2015 IL App (2d) 140733, ¶ 19.

Here, the judgment of dissolution was drafted by respondent's counsel, while petitioner was self-represented.

¶ 30 In reaching our holding, we note that, in the proceedings below, respondent did not assert that the dissolution judgment required modification based simply on the change in petitioner's employment. In his written closing argument, respondent argued that petitioner's change in employment constituted a substantial change in circumstances. However, he did not go on to argue that this automatically necessitated a modification of his maintenance obligation. Instead, he asserted that modification was appropriate based on an application of the statutory factors. Accordingly, although we have addressed the issue on its merits, we note respondent also arguably forfeited the issue. See *In re Marriage of Gabriel*, 2020 IL App (1st) 182710, ¶ 72 ("A party's '[f]ailure to raise an issue before the trial court forfeits review of that issue on appeal.' " (quoting *Finko v. City of Chicago Department of Administrative Hearings*, 2016 IL App (1st) 152888, ¶ 24)).

¶ 31 B. Application of Statutory Maintenance Factors

¶ 32 Respondent also argues the trial court erred in its application of the statutory factors set forth in sections 504(a) and 510(a-5) of the Act (750 ILCS 5/504(a), 510(a-5) (West 2022)) because it "ignored evidence as to statutory factors it must consider" and gave undue weight to other evidence. Respondent discusses each factor individually, pointing out evidence that he maintains the court afforded too much or too little weight and arguing the court's analysis of the factors was flawed in various other ways.

¶ 33 As previously discussed, once the trial court has determined a substantial change in circumstances has occurred, the court must then weigh the factors set forth in sections 504(a) and 510(a-5) of the Act (*id.*) and determine whether to modify the maintenance award. *Osseck*,

2021 IL App (2d) 200268, ¶ 48. Specifically, the court must consider the following factors pursuant to section 510(a-5):

"(1) any change in the employment status of either party and whether the change has been made in good faith;

(2) the efforts, if any, made by the party receiving maintenance to become self-supporting, and the reasonableness of the efforts where they are appropriate;

(3) any impairment of the present and future earning capacity of either party;

(4) the tax consequences of the maintenance payments upon the respective economic circumstances of the parties;

(5) the duration of the maintenance payments previously paid (and remaining to be paid) relative to the length of the marriage;

(6) the property, including retirement benefits, awarded to each party under the judgment of dissolution of marriage, judgment of legal separation, or judgment of declaration of invalidity of marriage and the present status of the property;

(7) the increase or decrease in each party's income since the prior judgment or order from which a review, modification, or termination is being sought;

(8) the property acquired and currently owned by each party after the entry of the judgment of dissolution of marriage, judgment of legal separation, or judgment of declaration of invalidity of marriage; and

(9) any other factor that the court expressly finds to be just and equitable."
750 ILCS 5/510(a-5) (West 2022).

¶ 34    The trial court must also consider the following factors set forth in section 504(a):

"(1) the income and property of each party, including marital property apportioned and non-marital property assigned to the party seeking maintenance as well as all financial obligations imposed on the parties as a result of the dissolution of marriage;

(2) the needs of each party;

(3) the realistic present and future earning capacity of each party;

(4) any impairment of the present and future earning capacity of the party seeking maintenance due to that party devoting time to domestic duties or having forgone or delayed education, training, employment, or career opportunities due to the marriage;

(5) any impairment of the realistic present or future earning capacity of the party against whom maintenance is sought;

(6) the time necessary to enable the party seeking maintenance to acquire appropriate education, training, and employment, and whether that party is able to support himself or herself through appropriate employment;

(6.1) the effect of any parental responsibility arrangements and its effect on a party's ability to seek or maintain employment;

(7) the standard of living established during the marriage;

(8) the duration of the marriage;

(9) the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities, and the needs of each of the parties;

(10) all sources of public and private income including, without limitation, disability and retirement income;

(11) the tax consequences to each party;

(12) contributions and services by the party seeking maintenance to the education, training, career or career potential, or license of the other spouse;

(13) any valid agreement of the parties; and

(14) any other factor that the court expressly finds to be just and equitable." *Id.* § 504(a).

¶ 35 A trial court's decision as to modification of maintenance will not be disturbed absent an abuse of discretion. *In re Marriage of Logston*, 103 Ill. 2d 266, 287 (1984). An abuse of discretion occurs when the court's decision is "arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the court. *Osseck*, 2021 IL App (2d) 200268, ¶ 49.

¶ 36 Here, the trial court did not abuse its discretion in denying respondent's motion to modify maintenance. The court's written order indicates that it considered the requisite statutory factors and related evidence in making its determination. For the reasons that follow, we find the court's analysis of the statutory factors was not unreasonable.

¶ 37                1. *Respondent's Retirement and Financial Situation*

¶ 38 The trial court did not abuse its discretion in finding respondent's retirement was not in good faith and that his earning capacity was not diminished. As the court noted, the only

evidence regarding respondent's ankle injury other than his own testimony was two progress notes from his medical providers releasing him to return to work with restrictions. The most recent note was from March 2022, approximately five months prior to the hearing, and it contained fewer restrictions than the note from the month before. Respondent indicated he had not seen his medical providers concerning his ankle since his visit in March 2022 and had not applied for disability benefits. The court found this evidence indicated respondent's condition was improving and he was able to work. The court's interpretation of this evidence was not unreasonable or fanciful. While respondent testified that his ankle injury prevented him from working as an ironworker, the court found this testimony was not credible. In light of the lack of corroborating evidence that respondent's ankle injury continued to prevent him from working, we defer to the court's findings, including its finding as to respondent's credibility. See *id.*

¶ 39        We reject respondent's reliance on *In re Marriage of Columbo*, 197 Ill. App. 3d 767 (1990), in support of his argument that the trial court "erred in imposing an artificial evidentiary burden" on him by finding that his testimony concerning his injuries was insufficient evidence that he was unable to return to work and instead requiring additional medical evidence. In *Columbo*, the court held the trial court erred by granting the wife's motion for judgment at the close of the husband's case on his motion to modify maintenance. *Id.* at 768-69. The *Columbo* court found the husband presented a *prima facie* case for the modification of maintenance where he testified he retired on the advice of his physician for health reasons. *Id.* at 769. In the instant case, unlike in *Columbo*, we are not tasked with reviewing whether respondent presented a *prima facie* case for modification. We also note the trial court in the instant case did not indicate that medical evidence was always required to establish that a party could no longer work; it

merely found respondent's testimony that he could no longer work was not credible in light of the limited medical evidence he presented.

¶ 40    We reject respondent's argument that the trial court erroneously minimized the nature of his injury by stating that he "broke his lower leg at the ankle which required surgery" rather than describing his injury as a "spiral fracture of the left fibula," as he testified. We find the court's description of respondent's injury was accurate, even if less precise than the testimony respondent provided, and it did not minimize the injury.

¶ 41    We also reject respondent's argument that, even if the trial court properly determined that he should not have retired, the court failed to consider the limitation his injury imposed on his earning capacity. Referencing the progress notes, respondent asserts: "Return to work doesn't mean the employer has to pay full union scale, and typically has meant *** that he was then only employable on light duty at a reduced rate of pay." However, respondent presented no evidence as to what the reduction in his pay would have been, if any, if he had returned to light duty. Moreover, respondent did not present any evidence that the restrictions his medical providers placed on his ability to work in March 2022 still applied.

¶ 42    Respondent also contends that the trial court should have considered his pension rather than his previous earnings as an ironworker to be his realistic present and future earning capacity. Respondent asserts that because he retired, he can no longer work for the union. However, as respondent presented no evidence he could not exit retirement and return to work as an ironworker, the court's finding was not an abuse of discretion.

¶ 43    2. *Petitioner's Job Search and Financial Situation*

¶ 44    We further find the trial court did not abuse its discretion in determining petitioner had made a reasonable, good-faith effort to find employment, her average income of

$1100 per month from her part-time jobs was representative of her present and future earning capacity, and her income from her part-time employment was insufficient to meet her monthly needs. The court's findings were supported by petitioner's testimony that she earned on average $1100 per month, did not have an advanced degree, lacked skills, could not afford to pursue additional education, lacked employment experience due to being a stay-at-home parent during the parties' marriage, and had applied for multiple jobs without success. There was also evidence that petitioner had attempted to start a business, but it was not profitable and petitioner did not have sufficient funds to invest "to really get it going." Petitioner's financial affidavit indicated that her monthly living expenses totaled $3032 and she also had significant debt.

¶ 45      Respondent argues that the trial court's finding that petitioner had no marketable skills was not supported by the evidence because petitioner testified that she was able to type, had sales experience as a brand ambassador, and had prior experience a cashier. However, the "skills" identified by respondent are fairly basic. The court did not abuse its discretion in finding petitioner had no marketable skills based on petitioner's testimony that she lacked skills, had no advanced degrees, and had a limited employment history.

¶ 46      Also, we reject respondent's argument that petitioner's financial affidavit indicating that she made $1100 per month from her part-time employment was contradicted by her testimony that she made, on average, $275 per shift and worked one to six shifts per week. Respondent's account of petitioner's testimony is inaccurate. Petitioner testified she earned, on average, $1100 per month. She did not testify that she made $275 per shift. She stated at one point: "I tried to average it out about approximately 275. It can be under 275 or it can be over." While petitioner did not specify what the number "275" referred to during her testimony, she indicated on her financial affidavit that she earned an average of $275 per week, or $1100 per

month. Also, petitioner testified that her most recent paycheck had been for $76 because she only worked one shift in two weeks, further indicating she did not earn $275 per shift.

¶ 47　　　　We also reject respondent's argument that the trial court erred in "considering and giving weight and deference" to petitioner's financial affidavit in finding she was unable to meet her monthly needs. Respondent contends that petitioner failed to attach paystubs, tax returns, and other supporting documentation to her financial affidavit and she failed to provide any records showing her expenses and debts. However, respondent has cited no authority for the proposition that a court may not consider a financial affidavit that does not include supporting documentation. We also note that, while respondent attached documentation to his affidavit demonstrating his past income, the only documentation he attached concerning his monthly expenses and debts were his bank statements. Petitioner's bank statements were also admitted into evidence during the trial. Accordingly, the court had comparable information from each party on which to assess the validity of the monthly expenses and debts reported in their respective financial affidavits. We note the parties reported having comparable monthly living expenses—approximately $3032 for petitioner and $2939 for respondent—despite the fact that respondent had no housing expenses.

¶ 48　　　　Respondent also asserts: "The trial court's finding that [petitioner] has only $1,100 a month from income is not consistent with the evidence, as her bank records show significant cash deposits that are not accounted for." A review of petitioner's bank records shows that she had monthly deposits that often exceeded $1100. However, the amounts of these deposits varied greatly from month to month, and it is not clear whether all of them were income from employment, as many of them were marked only "deposit." While the bank records suggest

- 18 -

petitioner may have understated her monthly income, they do not indicate that she earned significantly more than she suggested or earned enough to meet her monthly needs.

¶ 49 We also reject respondent's argument that, by noting that petitioner was a stay-at-home parent during the marriage, the trial court was finding this excused or prevented her from searching for employment after the dissolution. Petitioner's history of being a stay-at-home parent during the parties' marriage was relevant to her lack of marketable skills, her current and future employment prospects, her earning capacity after the judgment of dissolution, and the parties' standard of living during the marriage. Accordingly, the court did not err in considering it for these purposes.

¶ 50 3. *Failure to Make Specific Findings Concerning Each Factor*

¶ 51 Respondent contends that, for several of the statutory factors the trial court identified in its written order, the court merely cited facts related to the factors but failed to state how they either weighed in favor of or against the modification of maintenance. However, the court did not commit error, as it was not required to make explicit findings with regard to each factor. See *In re Marriage of Kocher*, 282 Ill. App. 3d 655, 661 (1996) ("Although a trial court must consider all relevant statutory factors, it need not make specific findings as to the reasons for its decision.").

¶ 52 4. *Alleged Failure to Consider Effects of Parental Responsibility Arrangements*

¶ 53 Respondent also contends the trial court committed reversible error by failing consider section 504(a)(6.1) of the Act (750 ILCS 5/504(a)(6.1) (West 2022)), namely, "the effect of any parental responsibility arrangements and its effect on a party's ability to seek or maintain employment." The court did not explicitly identify this factor in its written order. However, the written order reflects that the court considered evidence relating to this factor, as

the court noted that, although petitioner had been a stay-at-home parent during the marriage, the parties' daughter had recently turned 18 and was now emancipated. No evidence was presented that either party's ability to seek employment was currently affected by "parental responsibility arrangements," and there is no indication the court found otherwise.

¶ 54　　　　　5. *Allegedly Improper Consideration of Marital Misconduct*

¶ 55　　　　　Respondent also argues the trial court improperly considered "marital misconduct" in applying the section 504(a) factors by finding respondent's retirement was an attempt to evade his maintenance obligation. Respondent notes that section 504(a) provides that "the court may grant a maintenance award for either spouse in amounts and for periods of time as the court deems just, without regard to marital misconduct." *Id.* § 504(a). Here, the question of whether respondent retired in good faith was not an issue of "marital misconduct," as it did not occur during the marriage. The court did not err in considering respondent's motivation for his retirement, as it was relevant to the question of whether his maintenance obligation should be modified. See *In re Marriage of Waldschmidt*, 241 Ill. App. 3d 7, 13 (1993) ("Employment changes that are voluntary must be made in good faith and not prompted by a desire to avoid maintenance obligations.").

¶ 56　　　　　6. *Alleged Failure to Consider the Dissolution Judgment*

¶ 57　　　　　Respondent notes the trial court was required to consider whether there were any valid agreements between the parties as one of the statutory factors. See 750 ILCS 5/504(a)(13) (West 2022). Respondent asserts the court erred in finding no agreements existed because, he argues, the dissolution judgment contained an agreement that petitioner would obtain employment and that respondent's maintenance would be modified if she obtained employment. However, it is clear from the court's written order that it was aware of the terms of the

- 20 -

dissolution judgment, including the requirement that petitioner seek employment, and that it considered them in making its modification determination. And while it is true the court specifically found there were no agreements between the parties, it may well have been referring to the fact that the parties had not agreed as to whether maintenance should be modified in the present proceedings, which would have been an accurate observation.

¶ 58                    7. *Failure to Take a "Reserved-Jurisdiction Approach"*

¶ 59            Respondent further argues the trial court erred in failing to take a "reserved-jurisdiction approach," retaining jurisdiction to review respondent's ability to pay maintenance. Courts have held that a reserved-jurisdiction approach may be appropriate in situations where the responsible party is currently unable to pay maintenance or where the court seeks to monitor the circumstances of the parties. *In re Marriage of Scafuri*, 203 Ill. App. 3d 385, 395-96 (1990). For example, in *In re Marriage of Marriott*, 264 Ill. App. 3d 23, 41 (1994), the court held that a period of reserved jurisdiction was appropriate where the wife was eligible for maintenance but the husband was unable at the time to pay maintenance and meet his reasonable needs. Similarly, in *In re Marriage of Wojcik*, 362 Ill. App. 3d 144, 167-68 (2005), the court held that the trial court did not abuse its discretion in reserving a ruling on the wife's request for maintenance where the wife was otherwise entitled to maintenance, the husband currently lacked the ability to pay maintenance because his only income was disability benefits, and there was evidence his disability might lessen in severity in the future such that he could return to work.

¶ 60            Here, the trial court did not abuse its discretion by failing to take a reserved-jurisdiction approach to respondent's motion to modify maintenance. We note respondent did not argue below that the court should take a reserved-jurisdiction approach and has forfeited his claim on appeal. See *Gabriel*, 2020 IL App (1st) 182710, ¶ 72. Forfeiture aside, respondent has

cited no authority suggesting a reserved-jurisdiction approach is appropriate in a modification setting, and even if it is, whether it would be mandatory as opposed to discretionary. See *Wojcik*, 362 Ill. App. 3d at 168 ("As with other maintenance determinations, a trial court's decision to reserve jurisdiction on the issue of maintenance will not be disturbed absent an abuse of discretion."). Here, for the reasons already stated, we find the court's decision to deny the motion to modify maintenance was an appropriate exercise of its discretion.

¶ 61          8. *Exclusion of X-Rays and Testimony Concerning Respondent's Injury*

¶ 62          Respondent argues the trial court erred by refusing to admit photographs respondent had taken of a computer monitor in his doctor's office displaying X-rays of his ankle after his surgery and respondent's testimony that these X-rays showed nine screws, one steel strap, a washer, and a posttensioning cable in his leg. "The admissibility of evidence lies within the sound discretion of the trial court, and a reviewing court will not reverse the trial court's decision absent a clear abuse of discretion." *In re Marriage of Rudd*, 293 Ill. App. 3d 367, 371-72 (1997). Moreover, "a party is not entitled to a new trial unless a trial court's erroneous evidentiary ruling was substantially prejudicial and affected the outcome of the trial." *DiCosolo v. Janssen Pharmaceuticals, Inc.*, 2011 IL App (1st) 093562, ¶ 40; see *In re Marriage of Willis*, 234 Ill. App. 3d 156, 161 (1992) ("[E]rror in the admission of evidence does not require reversal if the evidence does not materially affect the outcome.").

¶ 63          Even if we were to find that the trial court abused its discretion by refusing to admit the photographs of the X-rays and respondent's testimony concerning what they depicted, respondent has not shown the court's refusal to admit this evidence was substantially prejudicial or affected the outcome of the proceeding. The key issue for the court to determine concerning respondent's injury was not the precise nature of the fracture. Rather, it was whether the injury

prevented respondent from continuing to work as an ironworker. The court permitted respondent to present evidence relevant to this issue—including his testimony about his ongoing inability to work, progress notes he received from his medical providers, and Marshall's testimony about his condition. After considering this evidence, the court concluded there was no credible evidence respondent was unable to return to work.

¶ 64                                  III. CONCLUSION

¶ 65            For the reasons stated, we affirm the trial court's judgment.

¶ 66            Affirmed.